# UNITED STATES

v.

**Turan ROZIER, 068 46 4808, Private (E–1), U. S. Marine Corps.**

**NCM 74 2978.**

U. S. Navy Court of Military Review.

Sentence Adjudged 26 March 1974.

Decided 17 Sept. 1975.

Appearances: LT Walter A. Smith, Jr., JAGC, USNR, Appellate Defense Counsel.

LCDR Harvey E. Little, JAGC, USN, Appellate Government Counsel.

### DECISION

MURRAY, Judge:

In a special court-martial bench trial, the appellant was convicted, contrary to his pleas, of disrespect towards a superior commissioned officer (Charge I), disobedience of a lawful order from that same officer (Charge II), and of three separate disrespect offenses toward superior noncommissioned officers (Charge III), in violation respectively of Articles 89, 90 and 91, Uniform Code of Military Justice, 10 U.S.C. §§ 889, 890, and 891. Sentenced to a bad conduct discharge, confinement at hard labor for one month, and forfeiture of $100.00 pay per month for three months, the intermediate reviewing authorities approved the sentence as adjudged.

Although contesting all the charges at trial, appellant addresses an assignment of error before this Court only as to Charge III and its three specifications dealing with disrespect towards superior noncommissioned officers. No assignment is made as to Charges I and II in which the evidence clearly establishes the guilt of the appellant beyond a reasonable doubt.

■ As to Charge III appellant contends that his "apprehension and detention by the Shore Patrol was unlawful and thus his resistance thereof was fully justified and therefore cannot be criminalized." The scenario relating to appellant's conduct on the late night and early morning of 2 and 3 December 1973 indicates that in the late evening of 2 December 1973, a Sunday, appellant went to the San Diego bus station to catch a bus back to Camp Pendleton. His unit was scheduled to leave for Twenty-nine Palms the next morning at 0500, so he was returning to his base Sunday evening rather than waiting until Monday morning. He arrived at the station at approximately 2230, and was told that the next bus would not leave for two hours. With time to kill, appellant first walked across the street to watch people play pool at a place called the Seven Seas. After awhile, he came back to the bus station and, in his own words:

> I sat down and I had all me [sic] clothes and utilities and things like that that I was going to take to Twenty Nine Palms and I set it beside me and I leaned forward and I put my hands like this here so that my head was in my hands and just sat there and dozed off to sleep.

> .    .    .    .    .

> I woke up and it was eleven twenty and I looked up at the clock, it was like that clock sitting right there and I just raised my head up and looked at it and put my head back down again. I would say that about fifteen minutes later on when the San Diego Police Department touched my arm and when I looked up he said "would you come outside with me, please". I got up and I walked outside with them and he said get in the squad car and I did get into the squad car and I sat back in the car and stared more [or] less and listened

to them talk on the radio because I had heard of them doing this before. I thought that it was a spot check or something like that so I sat back there and then I saw this Shore Patrol van drive up and one of the patrolman [sic] got out of the car and he talked to one of the guys in the Shore Patrol van and they talked for a few minutes and then he came to the car and told me to get out. I got out of the car and the Shore Patrol guy said stand over there by the van and I looked over there by the van and I stood there and they talked for about five minutes, I don't know exactly how long but about five minutes. At which time the Shore Patrol came up to me and said "get in the van". I said "what for" and he said "never mind just get into the van" and I said "I ain't getting in the van" and then they grabbed my arms and started to push me and I said "fuck no I ain't getting in the van" and pushed back. Then the Shore Patrol grabed [sic] me and through [sic] me on the ground and slapped my face against the cement and grabbed my arms and pulled them behind me and took the hand cuffs and squeezed [sic] them on as hard as they could. This is when . . .

Q. Did they put you in the van?

A. Yes, sir, after they slammed me down on the ground and hit my face, the side of my face on the ground. I had a bruise on my face from where then [sic] threw me down. [R. 45, 46]

It was later, back at the Shore Patrol building, that appellant became disrespectful to the three noncommissioned officers who took part in his detention although not in his original apprehension.

Appellant contends that his "apprehension" for sleeping in the bus terminal was not lawful because the sleeping did not violate any law, particularly Section 647, California Penal Code, which allegedly was the basis for the civilian police officer's initial taking of appellant into custody and then "turning him over" to the Shore Patrol on a "courtesy turnover." In this contention we find merit, but even in giving the full benefit of the doubt as to the propriety of the appellant's initial apprehension by civil authorities and "turnover" to naval authorities, we do not agree with appellant's novel defense that all conduct subsequent to the questionable apprehension and custodial exercise by civil and military authorities is immunized from criminal consequence as long as it comprises "resistance" to the unlawful apprehension and detention.

■ While an individual has a right to use reasonable force to resist an unlawful apprehension, there is a limitation on the bounds of conduct that is permissible under the circumstances. Each case must be examined on its own merits, and not all acts of misconduct can be justified under the guise of resisting unlawful apprehension and its attendant detention if the apprehension is effected. To suggest that a continuing course of violent, abusive conduct on the part of the detainee cannot be criminalized because of an initial defect in his apprehension is to deny the right of the remainder of society to a well ordered system. While the rights of the detainee may be violated in the initial questionable apprehension, there are remedies available to him through appropriate legal process to resolve that derogation. But to propose that he may resort to continued physical and/or verbal violence in violation of the law against those who had no part in the apprehension and were merely engaged in performing their duties as jailers after the apprehension was fait accompli, far exceeds the reasonable resistance that is recognized as acceptable to the initial unlawful apprehension.

Once appellant was handcuffed and placed (albeit rather forcefully) in the Shore Patrol van and transported to the Shore Patrol Headquarters, his "right" to resist what he believed to be an unlawful apprehension terminated. The apprehension (right or wrong) was complete, and the appellant's course of redress of the wrong he believed occurred was through the appropriate legal process (administrative or judicial) and not by compounding the prob-

lem through disrespect towards his superiors who were acting within the scope of their duties in effecting his detention until the matter was investigated and resolved.

We find the assignment of error as to Charge III to be without merit. The findings and sentence as approved below are affirmed.

Chief Judge CEDARBURG and Judge GLASGOW concur.